5 [From 1 Chase's Tr. p. 200.]

## Case No. 14,710.

UNITED STATES v. CALLICOTT et al.

[7 Int. Rev. Rec. 177.]

Circuit Court, E. D. New York. May, 1868.

INTERNAL REVENUE COLLECTOR — ACCEPTANCE OF FRAUDULENT BOND.

[On the prosecution of an internal revenue collector for accepting a fraudulent bond for the transportation of distilled spirits, evidence that the collector accepted 18 or 19 bonds, forged both as to principal and surety, in the same month, and that, when fraud was suggested, he delayed to institute an investigation, may be considered, as tending to show his participation in the fraud.]

The defendants [Thomas C. Callicott and John S. Allen] were the former collector of internal revenue for the Third district of New York, and his deputy. The indictment against them was founded upon the thirtieth section of the act of March 2, 1867 [14 Stat. 484], and the forty-second section of the act of July 13, 1866 [14 Stat. 162]. They were indicted jointly with others against whom the government discontinued.

E. W. Stoughton, Mr. Tracey, U. S. Dist. Atty., and Mr. Keasby, U. S. Dist. Atty. for New Jersey, for the United States.

Mr. Jenks and I. T. Williams, for defendants. Mr. Williams fell sick during the trial, and C. De Witt was added to defendants' counsel.

Before NELSON, Circuit Justice, and BENEDICT, District Judge.

NELSON, Circuit Justice (charging jury). The indictment in this case found against the accused is, in substance, that Callicott and Allen, collector and deputy collector of internal revenue of the Third collection district of New York and others named and unknown, contriving and intending to defraud the United States of divers sums of money payable for taxes upon 200 barrels of distilled spirits, on the 7th of May, 1867, conspired together to procure to be fraudulently executed, a certain bond required by the laws of the United States and regulations of the commissioner of internal revenue; that is to say, a bond for the transportation of distilled spirits dated the 7th of May, 1867, purporting to be a sufficient bond for the transportation, executed by R. H. Hand as principal, and William Malin and John Jaggard as sureties, for the sum of $30,000 each, conditioned for the transportation of the 200 barrels from the bonded warehouse of John Wilson, in Brooklyn, to the bonded warehouse of M. S. Cole, of the Third district of Massachusetts, Boston,—whereas, in fact, the name of Hand was forged and the sureties were insufficient and wholly worthless, as the said Callicott, Allen and the others well knew, by which fraudulent bond payment of the tax was evaded, and lost to the United States. The indictment also charges that Callicott and Allen fraudulently accepted this Hand bond for the transportation of spirits as above stated—as above described—and did thereup-

on permit and allow the 200 barrels to be removed from the warehouse of Wilson, well knowing the insufficiency of the bond and of the sureties.

This is the substance, gentlemen. of the charge in the indictment against the accused, —in what may be called the first count in the indictment. There is also a count in it charging a conspiracy of the defendants to connive at the fraudulent execution of this Hand bond, and to accept it as security within the act of congress for the transportation of the spirits from Wilson's warehouse; and upon the acceptance of which a permit was granted to remove the spirits to the warehouse in Boston already referred to. The offence as stated in the indictment is founded upon the thirtieth section of the act of March 2, 1867, and which provides that "if two or more persons conspire together to defraud the United States in any manner whatever, and one or more of them shall do any act to effect the object, the parties to the conspiracy shall be deemed guilty of a misdemeanor, and on conviction shall be liable to a penalty of not less than $1,000 nor more than $10,000 and to imprisonment not exceeding two years."

The acts of the parties, you will observe here described as constituting the offense, fall short of the actual commission of the fraud against the government. The conspiracy to defraud with any one act by either of the parties constitutes the offense. The mere combining or confederating to commit the fraud is sufficient without any actual perpetration of it, or loss or damage to the government if any one of them has taken, a step toward its execution, toward carrying into effect, as in the present case, the procurement of the fraudulent bond. That is one step—or the granting of a permit would be another step, for the withdrawal of the whiskey from the warehouse. The law strikes at the incipient steps, the germ of the offence, with a view the more effectually to deter persons from entering upon the fraud, and lays hold of them before its consummation.

The other offense charged, and which we refer to, is founded on the forty-second section of the act of July, 1866. It provides that if any person shall sign any fraudulent bond or permit, or other documents required by law, or who shall fraudulently procure the same to be executed, or who shall connive at the execution thereof by which the payment of any internal revenue tax shall be evaded, or attempted to be evaded, or which shall be executed for the purpose of withdrawing spirits from a bonded warehouse, on conviction shall forfeit all his interest in the spirits (if he has any,) and be imprisoned for a term of not less than one year nor more than five years. This act makes it an offence for any person to execute or to connive at the execution of a fraudulent bond, or to execute or connive at the execution of a fraudulent permit or other documents required by law,

with a view to evade the payment of the tax, or for the purpose of withdrawing the spirits from a bonded warehouse.

It will thus be seen. gentlemen, how specific and particular the offence or offences charged in the indictment in this case are described in the acts of congress—so specific that any person who can read cannot misunderstand them. more especially public officers who are appointed to carry into execution the laws and provisions of the acts; whose attention must, therefore, necessarily have been drawn to the particular provisions as the guide of their conduct and the foundation of their duties.

By the fortieth section of this act of 1866, distilled spirits which have been inspected, gauged and marked by an inspector may be removed without the payment of the tax from the bonded warehouse of the distillery, as exemplified in the case of Wilson upon the execution of a transportation bond, as the commissioner of internal revenue may prescribe,—which he has done, as you see from the form of the execution,—and may be transported to any general bonded warehouse used for the storage of spirits, and immediately (according to the law) on its arrival at the bonded warehouse to which the spirits have been transferred, they are to be again gauged, again inspected, and placed in the warehouse.

The Hand bond, which figures largely in this case, was got up under this provision of the law and the regulations of the commissioner That this bond was grossly fraudulent, and was got up for the purpose of defrauding the government by the removal of whiskey from Wilson's warehouse without paying the tax, is undeniable, and that it effected the purpose designed by procuring the removal of the 411 barrels—in two lots, I refer to the whole—without the payment of tax—whereby the government lost some $46,-000 tax, is equally true. The proof on this subject is overwhelming. We need not, therefore, give ourselves any trouble to look critically into the evidence as to the fact that the government was defrauded in this removal. Witnesses concerned and engaged in the execution of it, have given us a detailed account of the manner in which the fraud was perpetrated. The material and only question, therefore, left open for your examination and judgment, is whether the defendants, Callicott and Allen, were parties to this fraud, connived at it, or co-operated in its perpetration. It is the evidence in the case bearing upon this question—the whole of it so far as it has any bearing upon this question—that it becomes necessary that you should look critically into it, examine it, and upon which evidence you will find your verdict. Were they parties to this fraud? The question has been very fully, fairly and ably examined and discussed by each of the learned counsel who has addressed you on the subject, and I do not doubt but that you are already very fully possessed of the question,

and of all the evidence which has any pertinent bearing upon it. I do not intend, therefore, to be tedious in going over, for I am quite satisfied with the discussion by the learned counsel. All I intend is to draw your attention more especially and exclusively to the real question in the case—the question of fact in the case.

The ground taken in the defence is that Callicott, the collector, had no knowledge of the fraud in the execution of this bond—this Hand bond; that it was not executed before him, but before Allen, the deputy, and hence he had no means of knowledge, or even of suspicion, that there was anything wrong in getting it up, or in the execution of it. Now, this is certainly true as it respects the execution of the bond; it was not executed in his room in the building, but in the adjoining room—the front room, occupied by the deputy—and so far the ground taken on the part of the learned counsel is well founded on the evidence; but it should be remembered—he had it afterward in his possession for several days for the purpose of examination, and with a view to ascertain if it was good security for the tax on the whisky to be removed. When Hardy applied to him with the bond for the permit the first time, he declined to give the permit—and took the bond to look into it—took it from Hardy to look into it, and several days elapsed before Hardy called again for the permit. And when he did, the bond was still with Callicott, for he took it to look at it according to this witness and said he believed it was all right. Now, if he had really made an examination into the sufficiency of the security he would naturally look to the character and condition of the sureties as these were the most important names on the bond—sureties for the principal. Any examination instituted by any person of common understanding with the view to ascertain the sufficiency of the bond—the responsibility of it—for any purpose—would naturally lead the person to look to the conditions of the sureties upon it; and it is quite natural that the collector should have followed that view. Their places of residence were accurately upon the bond, and in this city where they resided. One of them, according to a witness, a responsible witness, whose tenant he was, states that Martin lives within ten minutes walk from the collector's office; the other, Jaggard, within about a mile from the office. If he had gone there, or if he had sent there to inquire of these names, as we see from the testimony in the case, the fraudulent character of the bond would have at once been revealed.

There is also another circumstance in respect to this bond which we think should not be overlooked. The experiment was tried upon Callicott to get a permit to remove this whisky without any bond, indicating thereby unmistakably a design to perpetrate a fraud by using him and his office in the removal of the whiskey. You recollect the application by Cunningham and the delivery of two blank permits to Callicott with a mark, I think made by McMullen, which was pointed out to him by Cunningham, and which permits he was requested to sign by his friend who had made these marks; and this without a transportation bond, without any sort of a bond. The meaning of this application could not be misunderstood, it was openly and undisguisedly made, and could have no other result if complied with—if the application was complied with—than to defraud the government. And I am sorry to say—sorry to be obliged to say—that Callicott entertained the application, received the blanks (the blank permits,) for further consideration; that is, according to the evidence of the witness. He took them and said he would see about them, instead of rejecting them instantly with indignation. Now, to say the least of this, Callicott, we see, was advised, and had a knowledge that these parties, Cunningham and McMullen, two of the conspirators, intended to perpetrate a fraud upon the government. He was thus put upon his guard by this fraudulent conduct, and if an honest officer, he would naturally have seen to it that no contrivance of theirs—no subsequent contrivance of theirs—such as getting up a fraudulent bond or otherwise, that the fraud should succeed. He was admonished that these persons had made an experiment upon him with a view to get the 200 bbls. from the Wilson warehouse without payment of the tax, and without any security—without any bond. The first lot, 200 barrels, was removed by means of this bond, and a permit was given upon the face of it by the collector. Instead of being taken to Boston according to the conditions or terms of the permit, a large portion of it was taken to rectifying establishments in this neighborhood, including Brown and others, a firm which embraced McMullen as one of the partners. Thus the fraud was perfected.

I shall not go into the details, but you remember the disposition that was made of it. A large portion of it was sold for $1.30 a gallon, and the money went into the hands of McMullen.

Afterward another application was made to the collector for the removal of 211 barrels from the same warehouse and by the same parties. This lot of whiskey was removed on the 24th and 25th of May. Now it is admitted—it is not to be denied upon the evidence—that this lot—this second lot—was removed without any bond. The old permit was used, the date being altered from the 14th to the 24th of May, and a transportation order of the same date—24th of May, signed by Callicott, was procured. These papers were procured by McMullen who afterward delivered them to Cunningham, and upon which the whisky was removed—211 barrels —not to Boston according to the directions in the order, but to these rectifying estab-

lishments in the neighborhood, especially to that of Brown and others. Unexplained, this is a manifest fraud upon the government by the collector—no bond, no payment of the tax.

But an explanation has been offered by the learned counsel for the defendants, and it is for you to examine it, and for you to determine the weight of it. It is this: that McMullen altered the old permit himself from the 14th to the 24th, and that the transportation order which was genuine and bore the same date, the 24th, was given under the supposition that it was intended to apply to the first permit—the permit of the 14th of May. It is not denied that the alteration in the old permit from the 14th of May to the 24th, was made by McMullen. It is proved to be in his handwriting and doubtless he altered it; but the transportation order dated on the same day of the alteration and signed by Callicott, he must have procured. He was the man who went to obtain the permit for the second lot, and who brought the papers and delivered them to Callicott, who delivered them to Dayton, the storekeeper. McMullen, therefore, must have got the transportation order which was issued on that day. Now, the first permit that was given on the 14th of May, conferred full authority upon these parties to remove 200 barrels of whisky from this warehouse to Wilson's. It required no transportation order—that is, none was given at the time; but the permit was given as full authority to the parties for the benefit of McMullen; he was the master spirit—for his benefit—full authority to remove the 200 barrels. The argument is, and you must give it such weight as you think it is entitled to, that the collector may have supposed that these first 200 barrels of whisky were not immediately removed upon that permit of the 14th of May, and that they may have remained there in the warehouse for the ten days, and that this order was given for the purpose of accompanying that first permit with a view to the removal of the first lot of 200 barrels. That is the argument, and that is the explanation which the learned counsel has given. It is for you to look at it, to examine all the circumstances connected with the removal of the second lot, and the papers on which it was made. Now, De Veau who was the bond clerk in the office, wrote this transportation order. He was the witness that testifies that he wrote it, and that it is in his handwriting; and he is the one you recollect, when it was removed by Dayton to the office, that was concerned in the alteration of the date of that order from the 24th to the 16th. He has given us no explanation of the order—of this transportation order—thus written by him. He has not given any explanation that it was issued for the purpose of accompanying the first permit of May 14. He has given no explanation of it, but left it unexplained. There was at least such indiscretion in giving this second order—or rather this transportation order—as very properly called for observations as respects official duty.

The collector knew that he had given this authority for the removal of 200 barrels on the 14th from Wilson's warehouse, and he thus gives a second authority to remove the same number of barrels ten days afterward, leaving it open to these parties engaged in both applications to him—these who had made the application for the removal of the first 200 barrels, and had also subsequently renewed the application for 211 more, and who had, in the first application indicated, a disposition to perpetrate a fraud upon the government in the removal of this whiskey. Under these circumstances, and in connection with these parties who are thus suspected, it would have been wise on the part of the public officer, before he put into their hands these two authorities, that could be used for the purpose of taking out a double quantity if he had instituted an inquiry, either by himself or by his clerks, or deputies, at the warehouse of Wilson, to see whether the first 200 barrels had not already been removed. I understand that it was not over a mile or two—two or three miles from the collector's office, this warehouse. It would have been no great trouble, consumed not much time to have instituted this inquiry when the application was made for two hundred barrels more, to see whether the first permit had been used in the transfer from the warehouse of the whisky.

There is one more topic I am going to call your attention to for a moment, and then I shall leave the case to you; and that is the circumstance connected with the application of the district attorney on the 28th of May, for the privilege of examining these bonded warehouses, B. You have that account from the assistant district attorney. What led to this application is a fact that seems to be in some dispute between the learned counsel, although I recollect distinctly the testimony of Mr. Allen, and it is on my notes. Twenty-one barrels of the last lot of the 211 were seized in the carts on the ninth, and were in the street in front of the office of the district attorney. The seizure of course, produced some sensation among the parties who were interested in the removal, and on the part of the district attorney, who was looking to the interests of the government. It seems that Mr. Allen in the interest of the government, went with Cunningham, who was interested in getting the 21 barrels released, to the office of the collector. Mr. Allen, the assistant district attorney, states that he there put the question to the collector whether this whiskey that was thus seized and detained had been removed in pursuance of an order from him, and the answer, as stated by Mr. Allen, was that he had given the order to remove from class A, Wilson's warehouse, to class B, general bonded warehouses. That is the testimony of Mr. Allen. It is questioned on the

part of the counsel for the accused, that is upon the contradiction which would exist between the two orders, for Allen's testimony is not mistaken, that the first transportation order was to carry this whiskey to Boston. The second transportation order, according to the account which we have from Mr. Allen, was not under that order, but under an order to transfer the whiskey from class A to class B, bonded warehouses. I don't put weight upon that, what I wish to call your attention to is this: This suggestion of the removal of the whiskey from the warehouse of Wilson to class B,—the general bonded warehouse,—excited the suspicion of the district attorney that there was something wrong about the removal. Hence, he instructed his assistant, on the 28th, to go to the collector and get the privilege of having these bonded warehouses, class B, examined, to see if he could find where this whiskey had been transferred. He went there, and on putting the question to him, the collector was unable to state to him in what particular warehouse, class B, this whiskey had been transferred. If he had been able to do so, why of course the assistant district attorney could have made the examination at once, but he was unable to tell him, and stated to him that Mr. Dayton, the removal officer, had the order or permit; that he was then gone and probably he would not be able to find it that afternoon, but he would see the officer and get the papers from him. Well, Allen called the next day, the 29th, and that day the collector was not in, but he saw Tappan, and all the papers that Tappan could find was this Hand bond and they examined that. He called the third day and saw the collector. He had not been able to see the storekeeper, the one who held the permit for this transfer to class B. He called on the 31st day, and although there was an arrangement that he would permit these warehouses to be examined if one of his deputies could accompany the district attorney or his agent, yet there was a postponement—there was a delay from the 28th to the 31st inclusive.

You must remember that the most of this whisky—the whole of it, indeed—had been removed on the 25th; it was in the city. Now, if there really was any ground for suspicion as suspected of this second lot of whisky, and the removal of it, and the perseverance on the part of the district attorney, with a view to get an opportunity to explore these warehouses with a view to find the whisky, if there was any real ground of suspicion, even the suggestion of suspicion, that fraud had been committed in the removal of this whisky from the warehouse of Wilson, why, certainly the collector should have been the first man that would have put in requisition all his official force for the purpose of ferreting out the fraud upon the government, that had been suggested in the removal of the whisky by the district attorney.

I shall not take up your time upon the fraudulent bonds in general. It would not have been remarkable nor singular, if, in the multitude of business of an office of this kind, occasionally an imposition should have been pressed upon him. But the idea that some eighteen or nineteen fraudulent bonds, forged both as to principal and as to surety or otherwise tainted with fraud; that there should have been that number accepted in succession, within a limit of about a month, was sufficient to excite surprise, if not suspicion, and call for an explanation.

Now, gentlemen, return to the question that I put to you in the opening, and that is: look at these facts; this testimony which I called your attention to, and if I have omitted anything in the facts that your attention has been called to by the learned counsel, examine all and determine whether or not these defendants have been parties to the fraud or connived at the fraud against the government which is admitted, and about which there is no controversy. If you are satisfied upon the examination of the evidence that they are, you are bound to convict; if not, to acquit them.

The jury then retired. After an absence of four hours they re-appeared, and stated through the foreman that they had not agreed upon a verdict.

THE COURT ordered them to retire.

The next day at 10 o'clock the jury appeared in the United States circuit court room and announced through their foreman that they were unable to agree. They were again ordered to retire. The foreman intimated that he desired to submit a few questions in a written form to the court for instruction on several points.

BENEDICT, District Judge, in view of the absence of the counsel for the prisoners, and the presiding justice, deferred answer until 1 o'clock, when the jury was summoned.

NELSON, Circuit Justice, then said: We have examined the request for instructions which was submitted to Judge BENEDICT this morning, and will instruct the jury upon the points submitted. First point: "Can the jury bring in a verdict on one of the statutes charged to have been violated, and alone?" Second point: "What is the legal weight of the testimony of the witness Cunningham?"

You may bring in a verdict formed on one of the provisions of law alleged to have been violated alone. The fact of the witness being a co-conspirator affects the credibility of his testimony, and the jury have a right to regard the question of credit; but if the testimony is corroborated by other witnesses, then credit is to be given to it. You may regard the weight of the evidence of a co-conspirator if it stands alone, but if it is corroborated, then you are bound to credit it. This case has occupied much time, and has been examined with attention by you, and it is highly important that a determination should

be arrived at. It has involved great expense to the government, and a new trial would necessitate renewed expense and delay; and it is therefore desirable that you should reach a conclusion without great delay. The jury will return.

The jury then retired, and at 7 o'clock they re-appeared and announced .that they had agreed upon a verdict, convicting Callicott, and acquitting the other defendant, John S. Allen.

Mr. Callicott was remanded to the penitentiary.

[NOTE. The defendant Callicott was, on June 5, 1868, sentenced to pay a fine of $10,000 and to be confined in the Albany penitentiary for the period of two years. In December following he petitioned for a writ of habeas corpus in the circuit court to inquire into the legality of his imprisonment. The petition was denied. Case No. 2,311. Subsequently, and a short time before the expiration of the two-year sentence, he again petitioned Circuit Judge Woodruff for a writ of habeas corpus. Between the time of the swearing to this last petition and the hearing on the application the petitioner was unconditionally pardoned by the president. The petition was, notwithstanding, prosecuted, and was again denied. Id. 2,323.]